| | | |
|---|---|---|
| S.H., K.W., R.B., M.W., A.F., and V.E., | * | IN THE UNITED STATES |
| | * | |
| | * | DISTRICT COURT |
| **Plaintiffs**, | * | |
| | * | FOR THE |
| **v.** | * | |
| | * | DISTRICT OF MARYLAND |
| UNIVERSITY OF MARYLAND BALTIMORE COUNTY, MARYLAND, | * | |
| | * | (Northern Division) |
| | * | |
| | * | [Motion to Proceed Anonymously] |
| **Defendant.** | * | |
| | * | |
| | * | Case No.: _____ |
| | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>COMPLAINT</u>

Plaintiffs, S.H., K.W., and R.B. ("Male Plaintiffs"), and M.W., A.F., and V.E. ("Female Plaintiffs") (collectively "Plaintiffs"), by and through their undersigned attorneys, Rignal W. Baldwin V, of Baldwin | Seraina, Jeffrey P. Bowman, Lucas Van Deusen, of BOWMAN JARASHOW LAW LLC, hereby sue Defendant, University of Maryland, Baltimore County ("Defendant" or "UMBC"), and in support, alleges the following:

## <u>PREFATORY STATEMENT</u>

1.      Plaintiffs, by this action, seek relief for injuries sustained as a result of the acts and omissions of UMBC, including its administrators, employees, and athletic staff, acting on UMBC's behalf.  Plaintiffs' claims relate to sexual abuse, harassment, and gender

discrimination that they suffered in violation of Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681, *et seq*. ("Title IX").

2.      Plaintiffs were, or are, student-athletes and members of the UMBC Swim Team.  The Swim Team was under the direction of then-Head-Coach, Chad G. Cradock.  Cradock was assisted by team administrators, employees, and athletic staff.  During his time as Head Coach, Cradock engaged in persistent acts of sexual abuse, harassment, and discrimination against all Plaintiffs, and UMBC's "response" was clearly unreasonable and deliberately indifferent.

3.      Incidents of misconduct involving student-athletes, including sexual abuse, harassment, discrimination, and retaliation, were all part of the accepted hostile sexual environment and culture of the UMBC Swim Team.

4.      The hostile environment was created by Cradock's unlawful conduct, and his and UMBC's deliberate indifference in their response to incidents of such misconduct, despite having actual notice.

5.      Despite prior complaints, in or around November 2020, UMBC finally started investigating Cradock's misconduct, issuing a no-contact order, forbidding Cradock from contacting Plaintiffs.  UMBC failed to take any steps, however, to enforce the no-contact order, or to reprimand Cradock for his violations of this order, exposing Plaintiffs to continued abuse, harassment, discrimination, and retaliation.

6.      Cradock's misconduct, and UMBC's "response," including the sustained hostility Plaintiffs experienced as a result, such as loss of coaching assistance and

punishment on the Swim Team, injured Plaintiffs and denied them access to educational opportunities.  To this day, Plaintiffs struggle with the aftermath of UMBC's failure to take necessary actions to provide adequate protections to Plaintiffs under its policies and federal and state law.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' statutory claim asserts a federal question.

8.      This Court has personal jurisdiction over UMBC pursuant to Federal Rule 4(k)(1)(a), because UMBC transacts business within this judicial district and state and is domiciled in the State of Maryland.

9.      This Court has supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367(a), because Plaintiffs' state law claims are substantially related to their federal claims, and arise out of the same case or controversy.

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all of the acts, events, and omissions that gave rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

11.     S.H. is a male student of UMBC's class of 2024, and a current Maryland resident.  S.H. was a swimmer on the UMBC Swim Team from 2020 to 2022.

12.     K.W. is a male graduate of UMBC's class of 2022, and a current Maryland resident.  K.W. was a swimmer on the UMBC Swim Team from 2017 to 2022.

13.     R.B. is a male student of UMBC's class of 2022, and a current Maryland resident.  R.B. was a swimmer on the UMBC Swim Team from 2018 to 2022.

14.     M.W. is a female graduate of UMBC's class of 2022, and a current Pennsylvania resident.  M.W. was a swimmer on the UMBC Swim Team from 2018 to 2022.

15.     A.F. is a female graduate of UMBC's class of 2022, and a current Maryland resident.  A.F. was a swimmer on the UMBC Swim Team from 2017 to 2022.

16.     V.E. is a female student of UMBC's class of 2022, and a current Maryland resident.  V.E. was a swimmer on the UMBC Swim Team from 2017 to 2022.

17.     UMBC is a higher education entity located at 1000 Hilltop Circle in Maryland.

18.     UMBC receives Federal Financial Assistance as an educational institution.

## FACTUAL ALLEGATIONS

### I.    BACKGROUND.

19.     From 1997, until his death by suicide in 2021, Cradock was a coach for, and later Head Coach for the UMBC Swim Team.

20.     In 2020, a group of Swim Team members filed complaints of sexual misconduct with UMBC's Title IX Office.

21.     As a result, UMBC retained Saul Ewing LLP to conduct a limited investigation of the most recent allegations of Cradock's sexual misconduct and retaliation against students.  Saul Ewing subsequently issued reports regarding its investigation.

22.     The Saul Ewing report reflects UMBC's systemic failure to prevent or address Cradock's sexual misconduct and discrimination.

II.     **CRADOCK'S SEXUAL ABUSE AND HARASSMENT OF UMBC STUDENTS**.

    *a.     Harassment and Sexual Assault of Male Swimmers*

23.     In addition to the *quid pro quo*, male swimmers, including Male Plaintiffs, were subjected to a torrent of unrelenting sexual commentary while at UMBC.

24.     The commentary focused on their bodies, their genitals, their weight, and other aspects of their appearance that interested Cradock.

25.     Cradock would comment, loudly and publicly, on the penis size of certain male swimmers.  Often times, such harassment, including unwanted touching of swimmers and inappropriate comments, would occur in the open on the "pool deck" during practice and swim events.  Such harassment would often be in clear view of other swimmers and UMBC administrative, employee, and athletic staff.

26.     For example, Cradock would often follow male swimmers into the locker room so that he could inappropriately observe their genitals.  Cradock was so bold as to demand to see male swimmers' genitals in the locker room.

27.     Cradock would also make comments to male swimmers that they looked "good" or "hot", and comment about his own masturbatory and other sexual habits.

28.     Cradock would also ask which male swimmers were purportedly homosexual.

29.     Cradock would grope certain Male Plaintiffs, engage in sexually explicit conversation, profess his "love" to certain male students, and demand that those students verbally reciprocate such remarks.  If Plaintiffs did not comply or engage with him, Cradock would punish them.

30.     At UMBC, Male Plaintiffs were subjected to unsolicited hugging, touching and grabbing of their genitals.  This conduct occurred on the pool deck and in the locker room.  At UMBC, Cradock slapped male swimmers' buttocks, pressed his body against male swimmers, rubbed their stomachs (while also engaging in sexually explicit conversation), grabbed them from behind without warning, and subjected them to unwanted kissing while he groped them.

31.     According to one male swimmer, Cradock's touching of genitals and other inappropriate sexual touching and harassment was "endless."

32.     Cradock would aggressively "tickle" some male swimmers in a way that made the victim and observers extremely uncomfortable.  Cradock's physical actions, his commentary, responses created a sexually hostile and abusive environment for Plaintiffs.

33.     Some swimmers were so brainwashed by UMBC's hostile environment that they believed that the behavior was simply the "way" Cradock coached.

34.     Despite having notice of such conduct, and similar occurrences, UMBC ignored the misconduct.

35.     Male swimmers, including Male Plaintiffs, were forced to endure sexual harassment and abuse by Cradock.

36.     The unspoken expectation and culture within the UMBC Swim Team was a *quid pro quo* between Cradock and the students.  Specifically, the exchange of athletic and educational attention for ignoring Cradock's sexually inappropriate and harassing behavior.

37.     The alternative to accepting the *quid pro quo* was that Cradock would penalize Plaintiffs by subjecting them to retaliatory conduct in order to maintain control over the UMBC Swim Team.

38.     Cradock created an environment wherein it was known that if students complained of, or about, the unwanted physical contact, that person would be given the "silent treatment" and not have access to coaching.

39.     This forced swimmers to make a choice: complain and be punished or tolerate the behavior and receive meaningful coaching and assistance.

40.     Both Male and Female Plaintiffs had to choose between enduring Cradock's abuse and harassment, or being ignored and marginalized on the UMBC Swim Team.

41.     Essentially, anyone who raised the issue of Cradock's inappropriate behavior would be treated as invisible, and would inevitably endure retaliation.

42.     Cradock was so emboldened by the atmosphere tolerated at UMBC, that when a male swimmer protested regarding unwanted and inappropriate contact, Cradock asked him "why don't you love me?" or "why don't you love me anymore?" in front of fellow UMBC employees.

43.     It was clear that Cradock favored certain swimmers and disfavored others, but not for legitimate reasons.   According to witnesses, Cradock's "chosen" male swimmers were most likely to be groped, or be a target to Cradock's inappropriate and unwanted sexual contact.

44.     Cradock's misconduct extended beyond practice and swim events.  Cradock would inappropriately contact Male and Female Plaintiffs via text messages, often late at night.  UMBC's Swim Team environment affected nearly every aspect of Plaintiffs' lives.

> **i.      Male Plaintiffs, S.H., K.W., and R.B.**

45.     On multiple occasions, without consent, Cradock touched, or attempted to touch, S.H., K.W., and R.B.'s genitals or buttocks while they were clothed or only in their small performance swimsuits.

46.     Cradock groped S.H., K.W., and R.B., and other male swimmers, on numerous occasions.   S.H., K.W., and R.B. all suffered from Cradock's unwanted, inappropriate, and sexually motivated physical contact.

> **1.      S.H.**

47.     For example, once, Cradock feigned a shoulder injury and asked S.H. to check his shoulder.  Cradock used the opportunity to grope S.H.'s genitals.

48.     UMBC created an environment where Cradock was the only UMBC employee to whom swimmers could report Title IX complaints.  As a result, UMBC did nothing while swimmers were subjected to a power dynamic with Cradock wielding control over every aspect of their lives.

49.     UMBC, in an effort to conceal Cradock's misconduct, would consistently demand that Plaintiffs, and other swimmers, come directly to Cradock with personal issues, including Title IX related reports or complaints, instead of other UMBC services.

### 2.     K.W.

50.     Additionally, Cradock would hug K.W. from behind and pin his arms to his chest to prevent K.W.'s escape.  Cradock would do this by surprise and without warning, to deprive K.W. the opportunity to avoid the unwanted physical contact.  Cradock would subject K.W. to persistent inappropriate sexual commentary, about K.W. or other UMBC Swim Team members.

51.     One evening, on a UMBC Swim Team competition trip, Cradock burst into K.W.'s hotel room, clothed only in his boxers, and began to wrestle with and tickle K.W.'s roommate.

52.     UMBC finally began an investigation in December 2020.  In violation of UMBC's no contact order and directive, Cradock texted K.W. and attempted to manipulate him into not cooperating with the investigation.

53.     Cradock did so by sending numerous old text messages where Cradock had been supportive of K.W.

### 3.     R.B.

54.     Further, Cradock would grope R.B. on the Swim Team pool deck, surprising R.B. with unwanted sexual contact.  For example, one swimmer witnessed Cradock "tapping" R.B. on his genitals during a swim event.

55.     R.B. was subjected to UMBC's hostile environment fueled by Cradock's sexual misconduct.

###### b.     *Gender-Based Discrimination of Female Swimmers*

56.     Female swimmers, including Female Plaintiffs, were also subjected to gender-based discrimination and harassment.

57.     Cradock specifically favored male swimmers over female swimmers when it came to coaching or other educational opportunities.  This was not merely an expression of gender bias, in that it was an expression of his sexual interest in young men.

58.     While female swimmers were spared the worst aspects of Cradock's "attention," they received minimal or no coaching, and were denied educational and athletic opportunities because of Cradock's favoritism.

59.     When the women's team had a success at a competition, Cradock was impassive and aloof to them, while providing special attention to male swimmers.  Instead of congratulating the women's team, he would berate the men's team for failing.

60.     Cradock delegated responsibility for the women's team to a subordinate, Coach Chris Gibeau.  By way of example, Coach Gibeau always rode on the women's bus with the team and Cradock always rode on the men's bus.

61.     The subordinate coach for the women's team even said that he was the only coach who cared about the women's team, and that he was unable to recruit or retain talented female swimmers as Cradock's attention was disproportionately focused on male swimmers.

62.     Female Plaintiffs were in an environment that interfered with their ability to participate fully in the UMBC Swim Team, due to UMBC's inaction.

63.     Cradock's hostility was not limited to the sexualized atmosphere of UMBC Swim Team practices.  Cradock demonstrated his disregard for female students in other ways.

64.     For example, Cradock asked a female swimmer if she had bruises because she had "upset" her boyfriend.

65.     Similarly, Cradock blamed another female swimmer for inciting a male swimmer to abuse her, and failed to take appropriate action as an employee of UMBC.

66.     In another instance, where a male swimmer was accused of assault, Cradock asked him in front of other swimmers, "Why do you always stick your dick in the crazy ones?"

67.     Cradock often referred to female swimmers as "bitches", and other inappropriate names in gender-biased ways.

68.     This is particularly shocking, given that the "crazy one was a female swimmer who had been beaten severely by a male swimmer.

69.     UMBC consistently required that issues such as dating violence, attempted sexual assault, and realized sexual assault, be reported to Cradock only.

70.     Female team-members were even required to go "undercover" and gather information from potential complainants, so that UMBC could circumvent Title IX and prevent reporting.

71.     Conversely, UMBC would reward students who came to Cradock with gossip and scandalous information, particularly if it was sexual in nature.

72.     Through Cradock, UMBC expressly told the students on the team that they were prohibited from reporting relationship violence or sexual misconduct to the UMBC Title IX Office, ever, for any reason.

73.     Only in retrospect has it been apparent that UMBC would do anything possible to avoid a Title IX report, especially from female students, because it could lead to problems for Cradock and the male swimmers.

74.     Female swimmers faced other forms of gender bias.  For example, disciplinary sanctions for male swimmers were significantly more lenient than for female swimmers.  Female swimmers labored under the "one strike" policy that UMBC enforced on them, while male swimmers, especially the "chosen" swimmers, all of whom were male, were granted far more leniency.  For example, UMBC kicked numerous female students off the team for alcohol infractions, whereas, a male swimmers would receive no, or minimal, repercussions.

75.     The environment at UMBC was so hostile and pervasive, in that it sometimes seemed normal to Plaintiffs.  Such conduct would often occur in public, likely to be in view of other UMBC athletic staff, administrators, and employees.

76.     A.F., M.W., and V.E. were three of the female swimmers who endured the discomfort and unease of a hostile and hypersexualized environment.

### c.     Hostile Environment

#### i.     A.F.

77.     A.F. witnessed the harassment and assault of her teammates, and like others, could not do anything to stop it.

78.     For example, A.F. witnessed a male swimmer who was encouraged, or required, to call Cradock "Daddy", "Coach Daddy", or "Chaddy Daddy" in public, and even at alumni events.

79.     A.F. was subjected to loud and hostile conversations, between Cradock and a male assistant coach who lived in Cradock's basement, regarding Cradock's sexual life and masturbatory habits.

80.     UMBC had convinced A.F. that a report to the UMBC Title IX Office would end her swimming career.

81.     A.F. saw Cradock aggressively hug other swimmers from behind, demand kisses, and touch the genitals of male swimmers.

#### ii.     V.E.

82.     At UMBC, V.E. also was subjected to an environment laced with verbal and physical sexual harassment of male swimmers.

83.     V.E. witnessed Cradock caress a male swimmer's stomach, stopping at the top of his speedo swimsuit, asking if the swimmer was "happy to see [him]."

84.    Male swimmers would talk about Cradock's behavior in front of V.E., recalling times Cradock had touched them in the genitals or talked about their bodies provocatively.

85.    V.E. had her own incident with a stalker on the UMBC Swim Team which she reported to Cradock and UMBC covered up.

86.    UMBC forbid all swimmers, including V.E., from contacting the UMBC Title IX Office, and acted to conceal the true nature of Cradock's behavior.

### iii.       M.W.

87.    M.W. was also affected by UMBC's gender bias.

88.    Despite being physically injured, M.W. persevered and continued to show up to practices, refusing to quit the team, even though Cradock repeatedly encouraged her to do so.

89.    UMBC particularly disliked M.W., saw her as "weak", and accused her of faking her injuries, because she was a woman.

90.    M.W. was frequently accused of faking injuries, but noticed that Cradock only accused female swimmers of malingering, not male swimmers.

91.    M.W. attempted to escape the hostile environment, but Cradock rejected her attempts to transfer training groups, further depriving her of educational opportunities at UMBC.

### III.   UMBC'S INTERFERENCE IN THE TITLE IX PROCESS AND DELIBERATE INDIFFERENCE.

92.    UMBC absolutely forbade, with threats, any interaction between students on the UMBC Swim Team and the UMBC Title IX Office.

93.    UMBC also warned students not to disclose anything to the athletic training staff for the UMBC Swim Team.  UMBC knew that the training staff could report to the UMBC Title IX Office, and avoid the closed system of the UMBC Swim Team.

94.    According to one athletic trainer, if a swimmer broke the code of silence, UMBC would not overtly punish that student, but would encourage the swimmers' peers to think negatively about the swimmer, completely ignore the swimmer, and refuse to coach them.   In doing so, UMBC's deprivation of educational opportunities was intentional.  That is, UMBC actively worked against that student's academic well-being.

95.    UMBC also ensured that Plaintiffs believed Cradock was extremely close to the then UMBC President and other powerful officials.

96.    UMBC forbade students under Cradock's supervision from reporting anything to the UMBC Title IX Office, athletic trainers, and other responsible UMBC employees.  Even when Cradock was forced to interact with the Title IX Office due to police involvement, the reports were evasive, misleading, and incomplete.  UMBC knew or should have known this, but did nothing to correct his failure to report.

97.    The effect of UMBC's intimidation was a culture of silence within the UMBC Swim Team.

98.     UMBC was willfully indifferent to Cradock's misconduct or nearly his entire career.

99.     Specifically, attorneys for UMBC who served in UMBC's Title IX Office, knew of Cradock's misconduct since at least 2019, and failed to take any action.

100.    In later interviews, Attorney Bobbie Hoye would claim complete ignorance of issues with Cradock, other than a single 2019 report of inappropriate conduct by him.

101.    Hoye could not, however, explain why she failed to follow up on the reports.

102.    While UMBC had many opportunities to stop the abuse and harassment, UMBC never followed up on the reports and never interviewed Cradock, or anyone else, about the reports.

103.    UMBC also ignored other reports and other facts showing that dating violence among swimmers was unreported.

104.    UMBC controlled what the swimmers ate, where they slept, and when they practiced, and delegated to Cradock the power to enforce a strict code of conduct on the UMBC Swim Team.

105.    UMBC exercised its power over virtually every aspect of Plaintiffs' lives with the understanding that if the UMBC Swim Team delivered winning results, Cradock was left to his own devices, at Plaintiffs' expense.

106.    UMBC gave Cradock power to decide what events students participated in, control their scholarship eligibility, revoke students' team membership, and their corresponding athletic scholarships without any supervision or oversight.

107.    UMBC's almost unlimited power over the student's lives, and ability to mete out discipline without UMBC oversight was used for Cradock's improper purposes.

108.    UMBC was more than just complicit in Cradock's misdeeds, in that its leadership ignored, covered up, a minimized his misconduct.

109.    UMBC knew that Cradock was a danger to its student-athletes but did nothing to stop it.

### a.    *The Reports*

110.    In 2020, certain athletic staff and students complained directly to UMBC's new Title IX Coordinator.  In November 2020, UMBC finally issued a "No Contact Instructions" and "Campus Restriction to Cradock."

111.    Cradock immediately violated this order.  Faced with a growing investigation, Cradock resigned as Head Coach of the UMBC Swim Team in December 2020.

112.    In December 2020, following Cradock's resignation, UMBC issued a Notice of Investigation to include additional complainants.

113.    In March 2021, Cradock committed suicide.

114.    UMBC has never been held accountable for their deliberate indifference toward Male Plaintiffs and Female Plaintiffs.

## COUNT I

**Discrimination on the Basis of Sex in Violation of
Title IX of the Educational Amendments Act
20 U.S.C. § 1681 *et seq.*
(By All Plaintiffs Against UMBC)**

115.    Plaintiffs hereby incorporate and re-allege each numbered paragraph as though fully set forth herein.

116.    The sex-based harassment and discrimination inflicted on Female Plaintiffs by UMBC was so severe, pervasive, and objectively offensive, that it deprived Female Plaintiffs access to educational opportunities and benefits.

117.    UMBC created and  subjected Female Plaintiffs to a hostile environment and discrimination in violation of Title IX, because, *inter alia*:

      *a.*    Female Plaintiffs were members of a protected class;

      *b.*    Female Plaintiffs were subjected to persistent harassment and inequitable treatment by Cradock of UMBC;

      *c.*    Female Plaintiffs were subjected to harassment by Cradock;

      *d.*    Female Plaintiffs were subjected to harassment based of their sex;

      *e.*    Female Plaintiffs were subject to egregious conduct and a hostile educational environment created by UMBC's failure to properly investigate or apply its policies and / or address the harassment and subsequent retaliation.

18

118.   UMBC had actual knowledge of the harassment, discrimination, and the retaliation permitted by its failure to investigate and discipline Cradock in a timely manner or consistent with its own policy or federal and state law.

119.   UMBC's failure to promptly and appropriately respond to the harassment of Female Plaintiffs resulted in Female Plaintiffs, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in UMBC's educational or activity programs in violation of Title IX.

120.   UMBC engaged in a pattern and practice of behavior designed to discourage and dissuade Plaintiffs, including Female Plaintiffs, who had been harassed and retaliated against by Cradock, from seeking protection and from seeking a full investigation of the harassment and retaliation.

121.   This policy and practice constituted disparate treatment of females and had a disparate impact on Female Plaintiffs.

122.   As a direct and proximate result of UMBC's acts and omissions, Female Plaintiffs have suffered damages, including, but not limited to, severe emotional or mental distress, pain and suffering, deprivation of educational benefits and / or activities provided by UMBC.

## COUNT II
### Sexual Abuse or Harassment in Violation of Title IX
### of the Educational Amendments Act
### 20 U.S.C. § 1681 et seq.
### (By Male Plaintiffs Against UMBC)

123.    Plaintiffs hereby incorporate and re-allege each numbered paragraph as though fully set forth herein.

124.    The sex-based harassment and abuse suffered by Male Plaintiffs was so severe, pervasive, and objectively offensive that it deprived Male Plaintiffs to educational benefits and activities provided by UMBC.

125.    UMBC created and subjected Male Plaintiffs to a hostile educational environment and sexual harassment or abuse in violation of Title IX, because, *inter alia*:

   *a.*    Male Plaintiffs were members of a protected class;

   *b.*    Male Plaintiffs were subjected to persistent abuse and harassment and inequitable treatment by UMBC;

   *c.*    Male Plaintiffs were subjected to sexual harassment or abuse by UMBC;

   *d.*    Male Plaintiffs were subjected to such UMBC's conduct on the basis of their sex;

   *e.*    Male Plaintiffs were subject to the egregious conduct and a hostile educational environment created by UMBC's failure to properly investigate, apply its policies, prevent the abuse, harassment, or subsequent retaliation.

126.    UMBC had actual knowledge of the abuse, harassment, discrimination, and the retaliation by Cradock.  However, UMBC failed to take action in a timely manner and consistent with its own policy or federal and state law.

127.    UMBC's failure to promptly or reasonably respond to the sexual abuse and harassment of Male Plaintiffs resulted in Male Plaintiffs being subjected to further abuse and harassment.  UMBC's indifference, predictably, led to Male Plaintiffs' exclusion from participation in, being denied the benefits of, and being subjected to discrimination in UMBC's educational and activity programs.

128.    By the time it issued reports, UMBC had engaged in a pattern and practice of behavior designed to discourage and dissuade Plaintiffs, including Male Plaintiffs, who had been abused, harassed, and / or retaliated against by Cradock, from seeking protection and from seeking a full investigation of the harassment and retaliation.

129.    As a direct and proximate result of UMBC's acts and its omissions, Male Plaintiffs suffered severe emotional and mental distress, pain and suffering.  Male Plaintiffs, as a result, were deprived of educational benefits and activities provided by UMBC.

<u>**COUNT III**</u>
**Deliberate Indifference to Harassment in Violation of**
**Title IX of the Educational Amendments Act**
**20 U.S.C. § 1681 et seq.**
**(By All Plaintiffs Against UMBC)**

130.    Plaintiffs hereby incorporate and re-allege each numbered paragraph as though fully set forth herein.

131.    Plaintiffs engaged in activity protected under Title IX when reporting to UMBC that Cradock had engaged in sexual assault, abuse, harassment, and discrimination, as well as when requesting UMBC's administrators, employees, and athletics staff for interim safety measures.

132.    Plaintiffs engaged in activity protected under Title IX when they participated in UMBC's process to determine whether Cradock had violated Title IX and UMBC's related policies.

133.    UMBC knew about Plaintiffs' protected activity because Plaintiffs reported the sexual assault, abuse, harassment, and discrimination, because she reported the conduct to its administrators, employees, and staff, and requested UMBC take action to investigate such claims.

134.    By its acts and omissions, UMBC retaliated against Plaintiffs because Plaintiffs engaged in activity protected under Title IX.  UMBC retaliated against Plaintiffs by, without limitation:

> *a.*    failing to enforce the "No Contact Instructions" and "Campus Restriction" regarding Cradock;

***b.***      failing to prevent Cradock from engaging in retaliatory conduct, for example, by Cradock communicating directly with some Plaintiffs after the investigation, in violation of UMBC's "No Contact Instructions" and "Campus Restriction"; and

***c.***      engaging in efforts to prevent Plaintiffs from engaging in various Title IX reporting.

135.     UMBC's conduct constituted a materially adverse action in response to Plaintiffs' activity protected under Title IX

136.     UMBC's retaliatory actions and omissions deprived Plaintiffs of access to its educational opportunities and activities and benefits.

137.     As a direct and proximate result of UMBC's retaliation, Plaintiffs suffered, and continue to suffer, losses of educational opportunities and benefits, along with injuries, damages, embarrassment, and humiliation.

138.     UMBC's failure to promptly and appropriately respond to the harassment and, resulted in Plaintiffs, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in UMBC's program and activities.

139.     Under the Fourth Amendment, Plaintiffs have the right as students in a public university to Equal Protection of Laws.

140.     UMBC and Cradock were state actors acting under the color of state law.

141.    As a direct and proximate result of UMBC's acts or omissions, Plaintiffs have suffered damages, including, but not limited to, severe emotional and mental distress, pain and suffering, deprivation of educational benefits and activities provided by UMBC.

**COUNT IV**
**Breach of Contract**
**(By All Plaintiffs Against UMBC)**

142.    Plaintiffs hereby incorporate and re-allege each numbered paragraph as though fully set forth herein.

143.    UMBC's Title IX policies contains express contractual obligations on behalf of UMBC for the benefit of Plaintiffs, which is supported by adequate consideration.

144.    Under UMBC's Title IX policy, a Responsible Employee is defined as including any UMBC community member who (1) has the authority to take action regarding Prohibited Conduct, covered under the Title IX policy, (2) is an employee who has been given the duty of reporting prohibited conduct under Title IX, or (3) is someone another UMBC community member could reasonably believe has this authority or duty.

145.    Cradock was a "Responsible Employee" under UMBC's Title IX policy, which was in place as of April 2018.

146.    Under this policy, prohibited conduct would include discrimination, sexual harassment (including, but not limited to, sexual assault, stalking, and retaliation), sexual exploitation and retaliation.

147.   Further, UMBC's "Discrimination and Equal Opportunity Policy" provides that UMBC does not discriminate in offering equal access to its educational programs and activities.

148.   Cradock was required to immediately share the known details of a Title IX incident, as described herein, with the UMBC Title IX Coordinator and officials.

149.   Further, UMBC was required to take appropriate, responsive, and prompt action to enforce its Title IX policies and to respond to any reports regarding the inadequacy or failure of another UMBC administrator, employee, and athletic staff to abide by its Title IX policies and procedures.

150.   As a result of UMBC's actions or inactions described herein, UMBC failed to adhere to its obligations under the Title IX policy by Cradock engaging in sexual assault and sex-based discrimination, subsequently, UMBC's failure to address his misconduct.

151.   UMBC's failure to adhere to its contractual obligations, by failing to promptly and appropriately respond to the harassment and abuse, caused Plaintiffs to be subject to continued harassment and abuse, further discrimination of Female Plaintiffs, on the basis of their sex in violation of Title IX.

152.   Further, UMBC failed to adhere to its contractual obligations by failing to enforce the "No Contact Instructions" and "Campus Restriction" regarding Cradock, which was issued by UMBC in or about November 2020, and by failing to prevent Cradock, as a Responsible Employee, from engaging in retaliatory conduct, for example, by Cradock communicating directly with some Plaintiffs after the investigation began.

153.    As a direct and proximate result of the UMBC's breach, Plaintiffs suffered, and continue to suffer losses of educational opportunities, activities, and benefits, along with injuries, damages, embarrassment, and humiliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, S.H., K.W., R.B., M.W., A.F., and V.E., respectfully requests that this Honorable Court:

A.    Enter a judgment against Defendant, University of Maryland Baltimore County, in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, together with interest, including statutory interest, and costs;

B.    Award Plaintiffs, S.H., K.W., R.B., M.W., A.F., and V.E., such reasonable attorneys' fees, expenses and costs in bringing this action;

C.    Grant such other and further relief as this Court deems just and proper.

# JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs, S.H., K.W., R.B., M.W., A.F., and V.E., demands a trial by jury on all issues so triable.

*/s/ Rignal W. Baldwin V*
Rignal W. Baldwin V

Date: May 31, 2023                    Respectfully Submitted,

*/s/ Rignal W. Baldwin V*
Rignal W. Baldwin V (Bar # 30136)
rbaldwinv@baldwin-seraina.com
Baldwin | Seraina, LLC
111 South Calvert Street, Suite 1805
Baltimore, Maryland 21202
T: (410) 385-5695
F: (443) 703-7772

*Counsel for Plaintiffs, S.H., K.W., R.B., M.W., A.F., and V.E.*

/s/ *Jeffrey P. Bowman*
Jeffrey P. Bowman (Bar # 28940)
jbowman@BowmanJarashow.com

/s/ *Lucas Van Deusen*
Lucas Van Deusen (Bar # 30274)
lvandeusen@BowmanJarashow.com

BOWMAN JARASHOW LAW LLC
162 West Street
Annapolis, Maryland 21401
P: (410) 267-9545
F: (443) 782-0201

*Counsel for Plaintiffs, S.H., K.W., R.B., M.W., A.F., and V.E.*